IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SANDY POINT DENTAL, P.C., | |
| Plaintiff, | 20 CV 2160 |
| v. | |
| THE CINCINNATI INSURANCE CO. | Hon. Robert W. Gettleman |
| Defendant. | Magistrate Judge Beth W. Jantz |

RESPONSE TO DEFENDANT'S MOTION TO DISMISS

SANDY POINT DENTAL, P.C., by and through its attorney CHARLES AARON SILVERMAN, hereby Responds to Defendant's Motion to Dismiss pursuant to F.R.C.P. 12(b)(6), stating:

**Introduction**

The facts underlying the Complaint in this matter are, by now, a familiar story: Plaintiff is a small business – in this case, a dentist's office. Complaint at ¶¶ 1-2. Due to the pandemic, and the government's response to it, Plaintiff was forced to halt most of its business. Complaint ¶ 3. Plaintiff had insurance for the purpose of mitigating the risk of such a work-stoppage. Complaint at ¶ 4. The Insurance company, Defendant here, has refused to pay out on the policy. Complaint at ¶ 6.

Many if not most Illinois businesses were impacted, from March onward, by Governor Pritzker's executive order closing all "non-essential" businesses, including Plaintiff here. As a result of them, for a time, Plaintiffs were barred from performing anything other than "emergency work." Complaint at ¶ 7. This was out of a fear that, absent such work-stoppages, Plaintiffs' employees and their clients would contract Covid-19, a virus that has been responsible for hundreds of thousands of deaths across the world, and over 100,000 deaths in the United States of America. See French, Christopher C., COVID-19 Business Interruption Insurance Losses: The Cases For and Against

1

Coverage (June 30, 2020). 27 Conn. Ins. L. J. 1, 3 (2020), Available at SSRN: https://ssrn.com/abstract=3639589, (hereinafter French).

The policy contains provisions for loss due to actions of the civil authority in two places: Building and Personal Property, and Business Income (and Extra Expense). The applicable one here is the Business Income (and Extra Expense) section. The Business Income section promises coverage for

> the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical "loss" to property at a "premises" which is described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss. With respect to "loss" to personal property in the open or personal property in a vehicle, the "premises" include the area within 1,000 feet of the site at which the "premises" are located. Motion to Dismiss, Exhibit A, 78 (hereinafter "policy.")

One such "Covered Cause of Loss" is a loss due to the actions of a "Civil Authority." That section reads:

> We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the "premises" due to direct physical "loss" to property, other than at the "premises", caused by or resulting from any Covered Cause of Loss. Policy, 79.

The Complaint seeks Declaratory Judgment (Count I), Damages for Breach of Contract (Count II), and a finding that the refusal to honor the insurance contract was vexations and improper under 215 ILCS 5/155 (Count III).

Naturally, the Motion to Dismiss focuses on the word "physical." The Motion envisions that the word "physical" refers only to physical or tangible damage to the structure that prompts the "Civil Authority" (that's the government) to shut it down, prompting a business income loss. The problem

is that a.) the policy itself makes it clear that it does not only apply to the physical structure of the building, b.) case law makes it clear that "physical damage" is not limited to tangible damage to the structure of the building, and c.) the insurance industry specifically recognized the applicability of its policies to pandemics and sought to disclaim them – something that would not have been necessary were such policies clearly inapplicable to pandemics and the governments' response. This policy does not contain such a disclaimer, but they exist, and many other policies do contain them. Finally, as will be argued, Plaintiff ought to be permitted to demonstrate, through discovery, that refusing to honor the policy was, in this case, vexations and in bad faith.

**Argument**

**I.     Standards on a Motion to Dismiss**

Under Federal Rules of Civil Procedure § 12(b)(6), dismissal of a complaint is proper where it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim on which relief may be granted. Hickey v. O'Bannon, 287 F.3d 656, 657 (7 Cir., 2002). The standard for dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is where the Plaintiff has failed to state a claim upon which relief can be granted. However, all well-pleaded facts, and any reasonable inferences drawn therefrom, are accepted as true and are construed in favor of the plaintiff. *Id.*; Stachon v. United Consumers Club, 229 F.3d 673, 675 (7 Cir. 2000).

Federal Rules of Civil Procedure § 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint so pled, "must provide the defendant with fair notice of what the ... claim is and the grounds upon which it rests." Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (citation omitted).

**II. The simple terms of the insurance contract make it clear that the damages Plaintiff suffered here were covered by the policy.**

"In construing the terms in an insurance policy, the court must ascertain the intent of the parties." Outboard Marine Corp. v. Liberty Mutual Ins. Co., 154 Ill.2d 90, 607 NE 2d 1204, 1217 (1992). "If the terms in the policy are clear and unambiguous, the court must give them their plain, ordinary, popular meaning." *Id.* "If a term in the policy is subject to more than one reasonable interpretation within the context in which it appears, it is ambiguous." *Id.* "Ambiguous terms are construed strictly against the drafter of the policy and in favor of coverage." *Id.* This is especially true with respect to exclusionary clauses." *Id.* "This is so because there is little or no bargaining involved in the insurance contracting process, the insurer has control in the drafting process, and the policy's overall purpose is to provide coverage to the insured." *Id.* The "public policy of this State… requires that insurance contracts be construed and enforced to accord with the objectively reasonable expectations of the *insured*." Posing v. Merit Ins., 258 Ill. App.3d 827, 629 N.E.2d 1179, 1183 (Ill. 3 Dist. 1994).

Here, the ambiguities in the policy are legion.

The policy, which ostensibly covers only damages related to the physical building, contains specific disclaimers of policy coverage for, among other things, suspensions of operations caused by "destruction or corruption of electronic data, or any loss to electronic data." Policy, 79. The "Building and Personal Property" section – which is one of the policies that covers Plaintiff here, though not the applicable one - quite explicitly covers the "Building" (it is in the name). But it also covers "stock." Policy, 9. It explicitly does not cover electronic data, and "costs to research" (Policy, 10), or loss due to "ordinance or law that is enforced *even if the building or structure has not been damaged*." (Policy, 11).

As the Motion points out, the policy very clearly states that it covers – in the case of the Building and Personal Property" section – the physical structure. Yet it also covers "stock." It also disclaims coverage of various intangibles. The section under which this suit is brought, the Business

4

Income (and Extra Expense) section, explicitly covers "direct physical loss to property." But it specifically disclaims loss due to electronic data – something that would be totally unnecessary if the policy were only intended to cover the physical building.

In this case, the building became unusable due to a condition affecting the physical property: being inside increases susceptibility to COVID-19. Morawska L, Tang JW, Bahnfleth W, et al. How can airborne transmission of COVID-19 indoors be minimised?. Environ Int. 2020;142:105832, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7250761/, (hereinafter "Morawska"). Due to the government's lockdown – the actions of the civil authority – Plaintiffs were unable to use their own facilities. This is precisely what the policy is meant to cover.

### III. Case law makes it even clearer that the policy should cover Plaintiff's damages.

Case law makes the picture even more clear. Policies of this nature have been interpreted many times in many states throughout the country, and in many federal courts. Physical damage, consistently, does not mean damage to the physical damage to the structure of the property.

**a. Case law supports fact that insurance coverage of "physical loss" is not relegated to tangible damage.**

The Complaint cites, for example, Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co., 308 Ill. App.3d 597, 720 N.E.2d 622, 625–26 (Ill. 1 Dist. 1999), which finds that asbestos – something that was placed in the building purposefully and did not threaten the structure of the building one iota – constituted damage to the physical building by simple fact of its existence. As that decision found:

> It would be incongruous to argue there is no damage to other property when a harmful element exists throughout a building or an area of a building which by law must be corrected. The view that asbestos fibers may contaminate a building sufficiently to allege damage to property has been recently adopted in a number of cases. The essence of the allegations [of the complaints] is that the buildings have been contaminated by asbestos to the point where corrective action, under the law, must be taken. Thus, the buildings have

> been damaged. *Id.* citing <u>United States Fidelity & Guaranty Co. v. Wilkin Insulation Co</u>., 144 Ill.2d 64, 578 N.E.2d 926 (1991)(internal citations removed).

That decision, in turn, quoted <u>Wilkin</u>, immediately *supra*, which found that asbestos within a building – put there on purpose as part of the structure of the building – "constitutes physical injury to tangible property" as opposed to "intangible economic loss in the form of diminished market values." *Id.* Similarly, infestations of termites have been considered physical damage to a physical building despite not physically damaging the building. <u>Posing v. Merit Ins.</u>, 258 Ill. App.3d 827, 629 N.E.2d 1179, 1183 (Ill. 3 Dist. 1994).

Outside of Illinois, other decisions have come to similar determinations. For example, the District Court in Oregon determined that the "infiltration of smoke into the interior of [a] theater is a covered 'physical loss of or damage to property'." <u>Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.</u>, 15 CV 1932, 2016 WL 3267247 (D. Or. June 7, 2016). In that case, the business loss was due to the infiltration of the smoke into the theater, making it impossible to hold events, including performances. The building itself was not damaged. However, the economic impact of the smoke was nonetheless covered as a physical incursion. *Id.* Similarly, ammonia discharge inflicted "direct physical loss of or damage to" a facility because its existence made the facility unusable – despite the lack of physical damage." <u>Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.</u>, 12 CV 4418, 2014 WL 6675934, at *6 (D.N.J. Nov. 25, 2014). The Massachusetts Superior Court found that carbon monoxide infiltration constituted physical damage because the term "direct physical loss or damage" is ambiguous. <u>Matzner v. Seaco Ins. Co</u>., No. 96-0498-B, 1998 WL 566658, at *3 (Mass. Super. Aug. 12, 1998). Gas buildup **<u>under</u>** (not in) a church was "direct physical loss" (despite the lack of direct physical loss) because it rendered the church unusable. Western Fire Ins. Co. v. First Presbyterian Church, 437 P.2d 52, 55 (Colo. 1968). Physical damage can also be an "odor." <u>Essex Ins. Co. v.</u>

6

BloomSouth Flooring Corp., 562 F.3d 339, 406 (1 Cir. 2009); Mellin v. N. Sec. Ins. Co., Inc., 115 A.3d 799, 805 (N.H. 2015); Farmers Ins. Co. of Oregon v. Trutanich, 858 P.2d 1332, 1336 (Or. 1993).

Defendant makes much of the fact that, in this case, Plaintiff was forced to close down because otherwise, there *would be* an infiltration of a deadly virus – not that there was an actual infiltration. However, much like gas under a church made it dangerous to operate inside of the church, COVID-19 made it impossible to operate inside Plaintiff's premises. The policy would be implicated, almost without question, if there was an undeniable physical infiltration of Covid-19 into the premises. That is to say, just like in the case of ammonia, carbon monoxide, a bad odor, and smoke, if COVID-19 had infiltrated Plaintiff's premises, perhaps by making one of Plaintiff's employees or patients sick, there would be ample precedent that a resulting business shutdown would be a covered loss. Here, the civil authority's lockdown preceded the infiltration, preventing it from happening. Had it not, the case would lack the ambiguity that Defendant attempts to insert.

The public policy implications of this reality are dire: This means that Plaintiff could have more undeniably fallen under the ambit of the policy by subjecting its employees and patients to the dangers of COVID-19 rather than doing the responsible thing, and shutting down. But the role of insurance is to give businesses the freedom to choose the safer route, not the incentive to live dangerously.

There was no physical damage or loss in the case of ammonia, odors, etc. The policies applied, by their apparently simple language, to business losses due to physical damage to the building – not to incidental business losses due to the building becoming unusable despite the lack of any physical damage. Nonetheless, courts have consistently held that such business losses constitute the effects of physical damage to the building. The terms physical damage, physical injury, and physical loss are all terms of art that have been interpreted to apply to work stoppage due to physical conditions that render the premises of the business unusable. This is what occurred here: due to a physical condition

7

– COVID-19 – the government prevented Plaintiff from using its physical premises, leading to a business loss.

Defendant's Motion attempts to cast doubt on the natural interpretation of the contract by pointing to several decisions, each of which is inapposite. For example, Defendant cites Stoneridge Development Co. v. Essex Ins. Co., 382 Ill.App.3d 731. 888 N.E.2d 633 (Ill. 2 Dist. 2008), claiming that its holding was that without physical property damage, a commercial policy is not impacted. However, far from refuting Wilkin, Stoneridge found that the incident in that case – shoddy and defective craftsmanship that diminished the economic value of the property – was a matter of contract damages as opposed to an incident of physical damage. It therefore found Wilkin inapplicable, as the decision stated: "damage in Wilkin Insulation Co. was not from asbestos's failure to perform its contractual function as an insulator, but, rather, "its detrimental impact was caused by a wholly ancillary and coincidental phenomenon, namely the diffusion of its harmful fibers." *Id.* Worse, Continental Cas. Co. v. Donald T. Bertucci, Ltd., 399 Ill.App.3d 885, 926 N.E.2d 833 (Ill. 1 Dist. 2010) has nothing to do with physical damage altogether. It is a complete red herring.

Defendant string cites several decisions, each finding that the grounding of aircrafts on September 11, 2001, did not constitute physical damage, with little explanation of the relevance to this matter. Following that string citation, Defendant cites Ward Gen. Ins. Servs., Inc. v. Employers Fire Ins. Co., 114 Cal.App.4th 548 (Cal. App. 2003), cited in MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co., 187 Cal. App. 4th 766 (Cal. App. 2010), which finds that loss of electronically stored data, in and of itself, was not "physical damage." Here too, the decision has little to do with this matter – to say nothing for the fact that electronically stored data is excluded explicitly in this policy.

Much closer to home are two decisions that Defendant attaches to the brief: Social Life Magazine Inc. v. Sentinel Ins. Co., 20 CV 03311-VEC (S.D.N.Y., 2020), and Gavrilides Management

8

Co. v. Michigan Ins. Co. Social Life Magazine is attached only as a transcript. It involves a Petition for a Preliminary Injunction that was denied by the trial-level state court in New York, applying New York law. Though the Court's denial of the Petition indicated that it remained unconvinced about whether the circumstance there – similar to this matter – constituted a physical intrusion, its treatment of the matter was cursory. Therefore, all that this court gets from Social Life Magazine is that one of the many courts to take up this issue found for the Defendant.

The Court gets even less from Gavrilides Management Co. v. Michigan Ins. Co. That decision, like the previous one, is a transcript of a hearing at the trial level of a state court applying state law – this time Michigan. In the case of Gavrilides Management, at least the Court offered its reasoning. But the reasoning makes it clear that Michigan law and Illinois law are at odds with one another. For example, the Court in Gavrilides Management finds that the physical loss must be "something that is tangible… that alters the physical integrity of the property," which would not be the case regarding asbestos, as per Wilkins. See Gavrilides Management at 22. In other words, Michigan law would not consider asbestos to be a physical loss while Illinois law does consider asbestos to be physical loss. Gavrilides Management therefore is of no help in determining the contours of Illinois on this question.

By contrast the United States District Court for the Western District of Missouri recently held directly the opposite of both of the above, finding that a plaintiff had stated a claim for physical loss due to lockdowns associated with COVID-19. Studio 417, Inc.v. The Cincinnati Insurance Co., 20 CV 3127-SRB (S.D. Missouri, August 12, 2020). In that matter, the Court analyzed the expression "direct physical loss," and found that it did not preclude claims for business interruption due to COVID-19. It did so by simply applying the dictionary definition of the applicable terms:

> The Merriam-Webster dictionary defines "direct" in part as "characterized by close logical, causal, or consequential relationship." Merriam-Webster, www.merriamwebster.com/dictionary/direct (last visited August 12, 2020). "Physical" is defined as "having material existence: perceptible especially through the senses and subject to the laws of nature." Merriam-Webster,

>www.merriam-webster.com/dictionary/physical (last visited August 12, 2020). "Loss" is "the act of losing possession" and "deprivation." Merriam-Webster, www.merriam-webster.com/dictionary/loss (last visited August 12, 2020). Studio 417, at 8.

The decision was further supported by references to various decisions interpreting similar insurance policies liberally so as to ensure that the insured's reasonable understanding of the policy was upheld. In Hampton Foods, Inc. v. Aetna Cas. & Sur. Co., 787 F.2d 349 (8th Cir. 1986), a policy that insured against "loss of or damage to the property insured… resulting from all risks of direct physical loss" was interpreted to cover "any loss or damage due to the danger of direct physical loss," *Id.* at 351-2, cited by Studio 417 at 9. Similarly, the "physical loss" language in a homeowner's policy was held to cover a spider infestation. Mehl v. The Travelers Home & Marine Ins. Co., Case 16-CV-1325-CDP (E.D. Mo. May 2, 2018), cited by Studio 417 at 9. There, the court found that since the policy did not define "physical loss" and since the insurance company "pointed to no language in the policy that would lead a reasonable insured to believe that actual physical damage is required for coverage," that "physical loss" is **_not_** synonymous with physical damage. *Id.*

Studio 417 found, further, that even absent a physical alternation, it was possible for a physical loss to occur. *Id.* at 10, citing Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 236 (3 Cir. 2002)(finding that the presence of asbestos constituted a physical loss); Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts, CV-01-1362-ST, 2002 WL 31495830, at 9 (D. Or. June 18, 2002)(" the inability to inhabit a building [is] a "direct, physical loss" covered by insurance"). Finally, Studio 417 explicitly rejects the holding in both Social Life Magazine (finding that "the presence of COVID-19 on premises… is not a benign condition") and Gavrilides Mgmt. Co.

### b. The Motion's arguments about how the nature of COVID-19 is different than other forms of physical damage should be rejected

The Motion also argues, somewhat bizarrely, that since COVID-19 can be cleaned, its impact cannot be covered by insurance. The notion that COVID-19 can be "cleaned" flies in the face of

10

reality. COVID-19 is an airborne viral pandemic spread by contact with carriers, not a contaminant that can be decisively removed from a premises with a cloth. This argument cites to an Ohio state Appellate Court decision finding that mold, which can be cleaned, does not impact a homeowner's policy that includes "physical loss" language similar to the language at issue here. Mastellone v. Lightning Rod Mut. Ins. Co., 175 Ohio App.3d 23, 2008-Ohio-311. Importantly, this decision directly contradicts Susan Lillard-Roberts, *supra*, which Studio 417, *supra*, cited with approval. The suggestion that "even if there was actual presence of the Coronavirus, there is no direct physical loss to property because the virus can be wiped away[1]," would not be legally relevant even if it made factual sense.

      The Motion's last line of attack is that the Civil Authority coverage was not triggered because Plaintiff was not prohibited from using the property due to a physical loss. The thrust of the argument is that since access to the building was not prohibited – just 95% of the things that Plaintiffs are paid to do in the building – the policy does not apply. Here, too, Studio 417 is instructive. There, the complaint did not allege that the government forbade all access to the premises – in that case, restaurants and clubs – just like here. Though some limited access was permitted, access was, by and large, either prohibited or strongly discouraged. Studio 417 at 14. This was sufficient to trigger the Civil Authority clause of the insurance policy. By contrast, if access to the premises was not "dramatically decreased," the policy may not be triggered. *Id.* citing TMC Stores, Inc. v. Federated Mut. Ins. Co., No. A04-1963, 2005 WL 1331700, at * 4 (Minn. Ct. App. June 7, 2005). Like there, the policy here covers circumstances in which the civil authority prohibits access (not "all access" or "any access") to the property – which is exactly what the Complaint alleges happened. *Id.*

---

[1] This assertion, which seems out of the Twilight Zone, only underscores the public policy reasons for finding for Plaintiff and allowing this lawsuit to move to the discovery stage. Plaintiffs insured themselves against having to choose between their business and their safety. "Just wipe it with a cloth" is not a suggestion that should be taken seriously when discussing this deadly pandemic.

Most of the decisions that the Motion cites which find that the civil authority had not prohibited access pertain to circumstances in which the civil authority's actions had the indirect effect of preventing access. For example, the Motion cites Southern Hospitality, Inc. v. Zurich Am. Ins. Co., 393 F.3d 1137 (10th Cir. 2004), which found that the civil authority clause was not triggered, as to hotels, when the FAA ground flights in the wake of September 11, 2001. Simply put, the FAA had prevented people from flying, not from checking in to hotels. Similarly, when bridge repairs prevented a majority of customers from visiting a ski resort, the civil authority clause was not triggered. Ski Shawnee, Inc. v. Commonwealth Ins. Co., 2010 WL 2696782, 4 (M.D. Pa. July 6, 2010). Finally, curfews related to riots technically prevented customers from being outside, but did not prohibit access to the insured's premises. Syufy Enters. v. Home Ins. Co. of Ind., 1995 WL 129229, at *2 (N.D. Cal. Mar. 21, 1995).

All of these decisions are distinguishable. In each case, the civil authority prevented the insured from doing business by doing something other than prohibiting access to the premises. In this case, as in Studio 417 found, the civil authority prohibited customers, clients, and patients from going into the premises of various businesses – in this case, a dentistry practice – in almost every event. That is to say, the civil authority prevented access to the premises.

That the prevention was due to a physical loss was already discussed, above. The same concept applies here. Studio 417, at 13, ("This argument is rejected for substantially the same reasons as discussed above. Plaintiffs adequately allege that they suffered a physical loss, and such loss is applicable to other property"). The stay at home orders at issue here covered large portions of Illinois, and impacted people – patients of Plaintiff included – very fundamentally. See *Id.*

**VI. The insurance industry created and promulgated specific clauses – not found in this policy – out of the realization that the "physical loss" language in policies would apply to pandemics like COVID-19.**

Finally, the insurance industry recognizes the fact that policies disclaiming losses unrelated to physical damages would not be sufficient to prevent liability in the case of a pandemic. The

> Insurance Services Office, Inc. (ISO), an association of approximately 1,400 domestic property and casualty insurers… is the almost exclusive source of support services in this country for [commercial general liability] insurance. ISO develops standard policy forms and files or lodges them with each State's insurance regulators; most CGL insurance written in the United States is written on these forms. Hartford Fire Ins. Co. v. California, 509 U.S. 764, 772 (1993).

In 2006, responding to the SARS outbreak, the ISO introduced suggested exclusions to existing policies – almost all of which are standardized to be identical or nearly identical to the policies at issue here. French, at 9. The proposed policy states "We will not pay for loss or damage resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." French, at 9. Insurance Service Office, ISO Form CP 01 40 07 06 – Exclusion of Loss Due to Virus or Bacteria 8, LI-CF-2006-175, attached here as Exhibit I (hereinafter "ISO Circular"). The ISO Circular identifies the source of its concern:

> Commercial Property policies currently contain a pollution exclusion that encompasses contamination (in fact, uses the term contaminant in addition to other terminology). Although the pollution exclusion addresses contamination broadly, viral and bacterial contamination are specific types that appear to warrant particular attention at this point in time. ISO Circular at 1, "Background."

The ISO Circular then explains that "Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case." ISO Circular at 6. Based on that concern, the ISO Circular suggests "an exclusion relating to contamination by disease causing viruses or bacteria or other disease-causing microorganisms." ISO Circular AT 6. This exclusion specifically seeks to bar recovery

premised upon "viral and bacterial contaminants" such as "rotavirus, SARS, influenza (such as avian flu), legionella and anthrax. The universe of disease-causing organisms is always in evolution." ISO Circular at 5. The specific exclusion reads: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." ISO Circular at 8.

In other words, not only did the industry recognize that its policies covered "physical loss" due to a pandemic or virus, it attempted to change certain policies to avoid liability. It did not change this policy. The policy therefore covers COVID-19.

## V. Plaintiff ought to be given an opportunity to conduct discovery as to whether Defendant's refusal to honor the contract was in bad faith.

Section 215 ILCS 5/155 provides an "an extracontractual remedy to policy-holders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable." Phillips v. Prudential Ins. Co. of America, 714 F.3d 1017, 1023 (7 Cir. 2013). "If there is a bona fide dispute regarding coverage — meaning a dispute that is real, genuine, and not feigned — statutory sanctions under section 5/155 are inappropriate." Id. (internal citations removed). "Because this statute is penal in nature its provisions must be strictly construed."

As stated above, since insurance companies have all of the power in terms of contract formation, and their customers are literally unable to negotiate about specific terms, insurance contracts must be construed against the insurer and in favor of the insured. Plaintiffs reasonably anticipated that their substantial losses, due to COVID-19 and due in particular to the government's response thereto, would be covered by their insurance policy. At the pleadings stage, Plaintiff should be entitled to conduct discovery into whether that expectation was correct, and whether Defendant's refusal to honor the policy was vexatious.

## Conclusion

At this earliest stage of litigation, the question before this court is whether Plaintiff may be able to demonstrate that a reasonable insured would believe the policy at issue here covers damages to Plaintiff's business due to COVID-19 and the government's reactions to COVID-19. In decision after decision, courts have made it clear that physical loss does not necessarily refer to some tangible change in the quality of the property. Rather, it is clear that a concern that having patients in the building would introduce COVID-19 to the building, and, thereby, to employees and other patients, constitutes real physical loss. Plaintiffs should not be forced to introduce the likelihood of such a contamination into the building – by remaining open (contrary to the recommendations of health professionals and policies of the State of Illinois) – in order to fall under the policy's ambit.

As demonstrated above, and specifically with reference to the Studio 417 decision, the trend presently is to allow suits seeking to apply civil authority and "physical loss" policies to damages stemming from COVID-19, and the government's reaction thereto, to move forward to the discovery stage. This makes sense in light of the requirement to construe insurance policies strictly against the insurer, particularly – as here – when there are serious ambiguities in the policy.

WHEREFORE, Plaintiff requests that this Honorable Court DENY Defendant's Motion and require Defendant to ANSWER the Complaint.

Charles Aaron Silverman (IARDC # 6291982)
For Plaintiff                                               Respectfully submitted,
8800 Bronx Ave #100-F
Skokie, IL 60077                                            s/Charles A. Silverman
(312) 526-3201
Chsilvlaw@yahoo.com